

**In The**
**Court of Appeals**
**Sixth Appellate District of Texas at Texarkana**

_____

No. 06-10-00012-CR

_____

JOHN WILLIAM TROTMAN, III, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 196th Judicial District Court
Hunt County, Texas
Trial Court No. 24916

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

Without warning, John William Trotman, III, burst through the front door of Ryan Rhoden's home on the evening of November 12, 2007, where Ryan's sister, Glenisha Rhoden, stood. Trotman was wearing a mask and carrying a butcher knife. He scuffled with Glenisha, demanding money and threatening her with the knife. On hearing the commotion, Ryan emerged from the hallway carrying a baseball bat. The three struggled and ended up in the bedroom, where they fell in a heap. While Ryan was on the floor, Trotman stabbed him in the heart, inflicting a fatal wound. Trotman fled the scene of the crime, but was arrested a short time later. A jury convicted Trotman of capital murder and sentenced him to life in prison. Trotman appeals his conviction, alleging four points of error.

We affirm the judgment of the trial court because (1) the trial court did not err in dismissing second chair counsel when the death penalty claim was abandoned, (2) the evidence is legally and factually sufficient to prove capital murder, (3) the trial court did not err in failing to instruct the jury on self-defense, and (4) the failure to request a jury instruction on the lesser-included offense of murder did not render Trotman's trial counsel ineffective.

*(1)* *The Trial Court Did Not Err in Dismissing Second Chair Counsel When the Death Penalty Claim Was Abandoned*

After the State announced its intention to seek the death penalty against Trotman, the trial court appointed Scott A. Cornuaud as second-chair counsel for Trotman, in accordance with

2

Article 26.052 of the Texas Code of Criminal Procedure.[1]  TEX. CODE CRIM. PROC. ANN. art. 26.052 (Vernon Supp. 2009).   A few weeks before trial, the State announced in open court that it no longer intended to seek the death penalty against Trotman.   Jury selection was scheduled to begin September 28, 2009, with trial to commence October 5, 2009.   At the time of the State's announcement, Cornuaud had been working on the case for ten months.   The trial court removed Cornuaud as counsel for Trotman over lead counsel's objection.[2]

---

[1]The order appointing Cornuaud provides, in part:

> The Court, after having reviewed the pleadings on file and hearing the evidence and arguments of counsel is of the opinion and so finds that the Defendant is entitled to second chair attorney to represent him against the charge of Capital Murder, as alleged by the State.   The Court finds that Scott A. Cornuaud has been approved for second chair trial counsel pursuant to the List Of Attorneys Qualified For Appointment To Death Penalty Cases In The First Administrative Judicial Region-Revised November 2008, a copy of pertinent parts which is attached to this order.

[2]This discussion occurred between the trial court and Toby Wilkerson, lead counsel for Trotman:

> [Wilkerson]:   And Judge, I'm asking Mr. Cornuaud be allowed to stay on the case because he's helped all along and he knows things.
>
> [Court]:   Okay.   But I cannot pay somebody legally, I don't think.   I can pay him for all he's done to this point.   I appoint for death penalty only.
>
> [Wilkerson]:   Judge, for the record the State has two attorneys and I think because it's capital and not just a regular case –
>
> [Court]:   It's not death.
>
> [Wilkerson]:   I understand that.   But just for the record, Judge, I'm asking that Mr. Cornuaud be allowed to remain on the case.
>
> [Court]:   Deny.

On appeal, Trotman contends the trial court erred in rescinding Cornuaud's appointment. We disagree.[3]

The right to any attorney is a fundamental right. *Gideon v. Wainwright*, 372 U.S. 335 (1963). If a defendant cannot afford an attorney, counsel shall be appointed by the court to represent the defendant. *Id.* at 344. Moreover, once the attorney-client relationship has been established, the trial court does not have plenary power to remove court-appointed counsel without sufficient cause. *Stearnes v. Clinton*, 780 S.W.2d 216, 221–22 (Tex. Crim. App. 1989) (en banc). Indeed, once a valid appointment has been made, the trial court cannot arbitrarily remove an attorney as counsel of record over objection. *Id.* at 223.

Trotman contends that the rescission of Cornuaud's appointment, merely because the State abandoned its plan to seek the death penalty, was not warranted and did not amount to good cause. Trotman cites Article 26.04(j)(2) of the Texas Code of Criminal Procedure, which provides:

> An attorney appointed under this article shall:
>
> [R]epresent the defendant until charges are dismissed, the defendant is acquitted, appeals are exhausted, or the attorney is relieved of his duties by the court or replaced by other counsel after finding of good cause is entered on the record.

TEX. CODE CRIM. PROC. ANN. art. 26.04(j)(2) (Vernon Supp. 2009).

---

[3]The State argues that this point of error was not preserved for our review, urging that no objection to Cornuaud's removal was asserted by Trotman or Wilkerson at the time of jury selection or at the time of trial and that the trial court's decision was not challenged by writ of mandamus. *See Buntion v. Harmon*, 827 S.W.2d 945, 946 (Tex. Crim. App. 1992) (orig. proceeding) (writ of mandamus to prevent attorney's removal from case is "normal vehicle" for seeking relief); *see also Stotts v. Wisser*, 894 S.W.2d 366, 367 (Tex. Crim. App. 1995). On the record before us, we decline to find a waiver of this point of error.

In further support of this contention, Trotman relies on *Stearnes.* In that case, Stearnes was appointed only one attorney, whose appointment was rescinded by the trial court after the attorney attempted to vigorously represent his client—by interviewing the primary witness for the State. On petition for writ of mandamus, the trial court was ordered to rescind its order removing Stearnes' counsel from the case, as it did not have the inherent power to validly remove appointed counsel. *Stearnes*, 780 S.W.2d at 223. Unlike *Stearnes*, the trial court's decision in this case was based on the elimination of the grounds for appointment of Cornuaud—the State's intention to seek the death penalty in the circumstance Trotman was found guilty.

Trotman also relies on *Stotts* in support of his contention that the trial court erred in rescinding Cornuaud's appointment. The *Stotts* case is likewise distinguished from the facts presented here. In *Stotts*, the defendant's only attorney was removed on an arbitrary basis without good cause; the removal was tantamount to leaving the defendant without an attorney. In fact, *Stotts* holds that, "absent a principled reason apparent from the record, a trial judge does not have discretion to replace appointed trial counsel over objection of both counsel and the defendant." *Stotts*, 894 S.W.2d at 368. In this case, Trotman continued to be represented by Wilkerson, an attorney who had been assigned to his case for more than a year and who was qualified to sit as first chair in a death penalty case.[4]

---

[4]Even though this was no longer a death penalty case, Wilkerson's name appears on the list of attorneys qualified for appointment to death penalty cases in the first administrative judicial region. Attorneys so qualified are selected by a local selection committee pursuant to Article 26.052 of the Texas Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 26.052.

5

This is not a situation in which the trial court rescinded Cornuaud's appointment based on nonexistent "inherent authority." Article 26.04(j)(2) of the Texas Code of Criminal Procedure explicitly contemplates the removal of appointed counsel "after a finding of good cause is entered on the record." TEX. CODE CRIM. PROC. ANN. art. 26.04(j)(2). The core issue, then, is whether the State's decision to abandon the death penalty constitutes good cause for Cornuaud's removal. Said another way, we must determine whether the abandonment of the death penalty constitutes a "principled reason" in support of the trial court's decision. We hold that it does.

Article 26.052(e) requires that:

> The presiding judge of the district court in which a capital felony case is filed shall appoint two attorneys, at least one of whom must be qualified under this chapter, to represent an indigent defendant as soon as practicable after charges are filed, *unless the state gives notice in writing that the state will not seek the death penalty*.

TEX. CODE CRIM. PROC. ANN. art. 26.052(e) (Vernon Supp. 2009) (emphasis added).

Clearly, Trotman was entitled to two appointed attorneys at the inception of his case, one of whom was statutorily required to be qualified in death penalty cases. The right to the appointment of two attorneys exists, however, only in those capital felony cases in which the State is seeking the death penalty. Furthermore, Article 26.052(a) provides, in part, that "this article establishes procedures in death penalty cases for appointment and payment of counsel to represent indigent defendants at trial . . . ." TEX. CODE CRIM. PROC. ANN. art. 26.052(a) (Vernon Supp. 2009).

6

The trial court expressed concern regarding authority to continue the appointment of two attorneys for Trotman, along with the payment of those attorneys, when it became apparent the State was no longer seeking the death penalty. This is a legitimate concern, given the statutory language quoted above which rather clearly states that only where the death penalty is being sought does an indigent defendant have the right to the appointment of two attorneys to represent him or her at state expense. Accordingly, we determine that abandonment of the death penalty constitutes a "principled reason" in support of the trial court's decision to rescind Cornuaud's appointment. In the interests of justice, we further note that, if any error did exist in the trial court's determination to rescind Cornuaud's appointment, any such error has not been shown to have been harmful. *See Brown v. State*, 182 S.W.3d 427, 430 (Tex. App.—Texarkana 2005, no pet.) (where there is no "total deprivation of the right to counsel," error is not structural and is subject to harmless-error analysis). We overrule this point of error.

*(2)*     *The Evidence Is Legally and Factually Sufficient to Prove Capital Murder*

We review the legal and factual sufficiency of the evidence supporting a conviction under well-established standards. In conducting a legal sufficiency review, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). We must give deference to "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable

7

inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia,* 443 U.S. 307, 318–19 (1979)). We are not required to determine whether we believe that the evidence at trial established guilt beyond a reasonable doubt; rather, when faced with conflicting evidence, we must presume that the trier of fact resolved any such conflict in favor of the prosecution, and we must defer to that resolution. *State v. Turro*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993). In conducting a factual sufficiency review, we consider the evidence in a neutral light. *Watson v. State*, 204 S.W.3d 404, 414–15 (Tex. Crim. App. 2006).

We may find evidence factually insufficient if (1) the evidence supporting the conviction is "too weak" to support the fact-finder's verdict, or (2) considering conflicting evidence, the fact-finder's verdict is against the great weight and preponderance of the evidence. *Laster*, 275 S.W.3d at 518. In so doing, we may find the evidence insufficient when necessary to prevent manifest injustice. *Id*. Although we give less deference to the verdict in a factual sufficiency review, we will not override the verdict simply because we disagree with it. *Id*. Both legal and factual sufficiency are measured by the elements of the offense as defined by a hypothetically-correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *see also Grotti v. State*, 273 S.W.3d 273, 280 (Tex. Crim. App. 2008).

Under a hypothetically-correct charge, the jury was required to find, beyond a reasonable doubt, that (1) Trotman (2) on or about the 12th day of November, 2007, (3) intentionally and

8

knowingly (4) caused Ryan's death (5) by cutting and/or stabbing him with a knife, and (5) Ryan's murder was committed intentionally in the course of committing or attempting to commit a robbery. Trotman takes issue only with respect to the final element—that Ryan's murder was committed intentionally in the course of committing or attempting to commit a robbery.

Section 19.03(a)(2) of the Texas Penal Code provides that a person commits capital murder if the person commits murder and the person "intentionally commits the murder in the course of committing or attempting to commit . . . robbery . . . ." TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon Supp. 2009). Section 29.02(a) of the Texas Penal Code states that a person commits robbery if the person, in the course of committing a theft, "(1) intentionally, knowingly or recklessly causes bodily injury to another; or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." TEX. PENAL CODE ANN. § 29.02(a) (Vernon 2003). Trotman maintains that, because the primary evidence for the allegation of robbery is Glenisha's testimony, and her testimony is filled with errors and contradictions, the evidence is legally and factually insufficient to support the verdict.

Glenisha testified that, while she stood in the doorway of her brother's home on the evening of his murder, she and Ryan—who was in another room of the house—were talking to each other. Glenisha did not see anyone on the porch when she came into Ryan's house, and she never heard Trotman behind her. Trotman caught Glenisha off guard, came at her from behind with a knife in his hand, and told her to "give me the . . . money." When Glenisha replied that she

9

had no money, Trotman again demanded that she give him money. Again, Glenisha indicated that she had no money. Trotman demanded money yet a third time, and told Glenisha to put the money in his bag. Glenisha replied that she was unemployed and that she could not give him something she did not have. She could see a knife in Trotman's hand as he was standing behind her so closely that he was touching her. Trotman was holding a bag and demanded "give me the . . . money and put it in the bag."

Glenisha struggled with Trotman, attempting to pull away the "do-rag" scarf that covered his lower face. During the struggle, Glenisha broke her nails down to the quick. Upon hearing the commotion, Ryan came to Glenisha's defense with a baseball bat, and the three struggled and ended up fighting in the hallway and in the bedroom, where the stabbing occurred. Trotman fled the scene, and Glenisha was able to find a telephone to contact police.

To dispute the robbery allegation, Trotman points out the errors and contradictions of Glenisha's testimony. While Glenisha testified that she struggled with Trotman and broke her fingernails scratching his face, the DNA report revealed that Glenisha's fingernail scrapings excluded Trotman as the source of the DNA.[5] Trotman also points out that Glenisha testified that he held the knife in his left hand, but she did not see anything in his right hand. In contradiction to this, Glenisha later testified that Trotman carried a bag during the robbery. While Glenisha

---

[5]The DNA report excludes Trotman as a contributor to the right-hand fingernail clippings from Glenisha. The report does not indicate fingernail clippings were taken from Glenisha's left hand.

claims she was injured by the knife Trotman wielded, DNA analysis failed to confirm this claim.[6] No property or cash was alleged to have been taken from Glenisha or Ryan.

Finally, Trotman argues that, while Glenisha testified that Trotman was behind her in the hallway pushing her forward during the attack, she also testified that Ryan tripped and fell over a cord in the bedroom and Trotman fell on top of him. Having also tripped, Glenisha fell on Trotman. Trotman maintains that this scenario is only possible if Trotman was in front of Glenisha, rather than behind her. We point out, however, that Glenisha's testimony, read in context, reveals that the struggle between her and Trotman was moving in the direction of the hallway, and Ryan met them coming out of the bathroom. Ryan then grabbed a bat, and the three struggled in the hallway. The written record contains the oral description of the struggle and does not supply the precision one might get from a video recording. There is simply no way to know the precise details of how the struggle took place and who was behind whom at any given point during that struggle.

The State contends the evidence is sufficient to establish beyond a reasonable doubt that Trotman intentionally murdered Ryan in the course of committing or attempting to commit a robbery. Judging from the condition of the house after the murder, it was obvious there had been a struggle. Pictures had been knocked off the wall, and the floor was littered with broken glass.

Glenisha testified that Trotman attempted to commit robbery as he came through the door

---

[6]Two knives were found at the scene; one was located on the floor at the entrance to the bedroom and the second was located on the floor near the aquarium in the living room area. Only one knife was subjected to DNA testing. This knife was the murder weapon; DNA testing showed that this knife contained Ryan's blood.

of Ryan's house with a knife in one hand and a bag in the other yelling, "give me the . . . money" and "put it in the bag." She was frightened because Trotman held the knife close to her body while demanding money. The knife with which Trotman threatened Glenisha was the same knife used to murder Ryan.

The State also relies on the testimony of Latisha Jones in support of its contention that the evidence is sufficient to prove beyond a reasonable doubt that Trotman intentionally murdered Ryan in the course of committing or attempting to commit a robbery. Jones lives in Greenville and met Trotman only a few months before the murder. Trotman was living in Dallas, and Jones would drive to Dallas and pick him up on weekends to stay with Jones at her home in Greenville.

Jones knew Ryan—he was a distant relative. She also considered Ryan to be a friend. Jones saw Ryan on the Friday and Saturday before the murder when she went to his home to purchase marihuana. Trotman accompanied her on both occasions, but did not go inside Ryan's house. As far as Jones knew, Trotman and Ryan did not know one another.

On the evening of the murder, Jones planned to go to her aunt's house to get something for her headache; Trotman accompanied her. When they arrived at the home of Jones' aunt, Trotman stayed in the car. When Jones returned to the car, Trotman was gone. After visiting with her aunt a bit longer, Jones and her aunt walked outside, where they spotted Trotman running from around the corner. Trotman got in the passenger side of the car while telling Jones to "Drive, Tish. Drive." He was winded and told Jones not to return home via the same route (which would

12

take them past Ryan's house). When Jones asked Trotman what was going on, he told her, "I tried to get that nigger. It was time to eat." Jones stopped the car and asked Trotman what he tried to do and he said it was time to eat—she thought he meant he tried to rob somebody. Trotman told Jones that he poked Ryan with a knife he had taken from her kitchen and that, since he told her what happened, he was going to have to kill her and her children. Jones fully believed he was capable of doing that. The police came to Jones' house twice that night to investigate Trotman's role in the murder and arrested Trotman that same night.

Trotman claims that the foregoing evidence is both legally and factually insufficient to prove the element of robbery to support the charge of capital murder. We disagree. When considering this evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found the essential elements of the crime—in particular, the element of robbery—beyond a reasonable doubt. *See Laster*, 275 S.W.3d at 517. Further, and upon objective review of the record, we cannot conclude that the evidence supporting the verdict is so weak as to be clearly wrong or manifestly unjust. We do not find the verdict to be against the great weight and preponderance of the conflicting evidence. We therefore conclude that the evidence is legally and factually sufficient to support the verdict of guilt. Trotman's legal and factual insufficiency points of error are overruled.

*(3)     The Trial Court Did Not Err in Failing to Instruct the Jury on Self-Defense*

A defendant is entitled to an instruction on self-defense if the issue is raised by the

13

evidence, whether that evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the defense. *Ferrel v. State*, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001); *Guilbeau v. State*, 193 S.W.3d 156, 159 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). Before a defendant is entitled to a self-defense instruction, however, there must be some evidence, when viewed in the light most favorable to the defendant, that will support the claim. *Ferrel*, 55 S.W.3d at 591; *Hill v. State*, 99 S.W.3d 248, 250 (Tex. App.—Fort Worth 2003, pet. ref'd). Thus, entitlement to a self-defense instruction is predicated on the provision of some evidence that the defendant was authorized to use force against another. "[A] defense is supported (or raised) by the evidence if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true." *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007). A defendant need not testify in order to raise a defense. *Boget v. State*, 40 S.W.3d 624, 626 (Tex. App.—San Antonio 2001), *aff'd*, 74 S.W.3d 23, 26 (Tex. Crim. App. 2002). Defensive issues may be raised by the testimony of any witness, even those called by the State. *Jackson v. State*, 110 S.W.3d 626, 631 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd). When reviewing a trial court's decision to deny a requested defensive instruction, "we view the evidence in the light most favorable to the defendant's requested submission." *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006). However, "if the evidence, viewed in the light most favorable to the defendant, does not establish self-defense, the defendant is not entitled to an instruction on the issue." *Ferrel*, 55

S.W.3d at 591.

Trotman argues that the trial court should have included an instruction on self-defense in the charge, in light of the evidence raised on that issue. He directs our attention to the following evidence: (1) two knives found at the Rhoden house, only one being the weapon used on Ryan; (2) Jones' testimony that, when Trotman returned to her car that evening, he was bleeding and told Jones that someone hit him in the head with a baseball bat and that he "poked" that person with a knife; (3) Jones' testimony that Trotman had cuts and injuries to his hands that were not there earlier that day; (4) testimony of Dr. Reade Quinton, the Dallas County medical examiner, that Ryan suffered injuries to his lower legs and the bottom of his foot, which injuries could have been caused by stepping or stomping on the knife; and (5) Quinton's testimony that Ryan's fatal chest wound was not inconsistent with the theory that it could have been delivered by someone on the floor (at a lower angle) than Ryan. When the foregoing evidence is analyzed in light of the requirement that some evidence must be raised on each element of the defense, we conclude the trial court was correct in its decision that an instruction on self-defense was not warranted. Section 9.31 of the Texas Penal Code provides, in part, that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a) (Vernon Supp. 2009). Moreover, Section 9.32 of the Texas Penal Code provides:

15

(a)   A person is justified in using deadly force against another:

(1)   if the actor would be justified in using force against the other under Section 9.31; and

(2)   when and to the degree the actor reasonably believes the deadly force is immediately necessary:

(A) to protect the actor against the other's use or attempted use of unlawful deadly force; or

(B) to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

TEX. PENAL CODE ANN. § 9.32(a) (Vernon Supp. 2009).

The record is devoid of evidence that Trotman reasonably believed the use of force was immediately necessary to protect himself from the use or attempted use of *unlawful* deadly force, or to prevent the commission of any of the offenses listed in Section 9.32 of the Texas Penal Code. Instead, the facts here indicate that Trotman burst into Ryan's home, wielding a butcher knife and demanding money.[7]   The evidence does indicate that Ryan hit, or attempted to hit, Trotman with a baseball bat.   The evidence also reveals that Ryan seized the bat in order to defend himself and his sister from Trotman's violent, and ultimately deadly, attack.   Under these circumstances, Trotman was not entitled to an instruction on self-defense.   This point of error is overruled.

 *(4)   The Failure to Request a Jury Instruction on the Lesser-Included Offense of Murder Did Not Render Trotman's Trial Counsel Ineffective*

---

[7]The use of force is not presumed to be reasonable when the actor was otherwise engaged in criminal activity (other than a class C misdemeanor) at the time the force was used.   TEX. PENAL CODE ANN. § 9.31(a)(3) (Vernon Supp. 2009).

16

Trotman also contends that his trial counsel provided deficient assistance because he failed to request an instruction on the lesser-included offense of murder. Trotman further contends that his counsel's deficient performance probably caused the jury to return a verdict of capital murder rather than murder. Trotman raised this ineffective assistance claim on direct appeal, arguing that trial counsel should have requested a lesser-included offense charge as it would apply to the offense of murder.

The standard of testing claims of ineffective assistance of counsel is set out in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on this claim, an appellant must prove by a preponderance of the evidence (1) that his or her counsel's representation fell below an objective standard of reasonableness and (2) that the deficient performance prejudiced the defense. *Id.* at 689; *Rosales v. State*, 4 S.W.3d 228, 231 (Tex. Crim. App. 1999). To meet this burden, an appellant must prove that the attorney's representation fell below the standard of prevailing professional norms and that there is a reasonable probability that, but for the attorney's deficiency, the result of the trial would have been different. *Ex parte Martinez*, 195 S.W.3d 713, 730 (Tex. Crim. App. 2006); *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). Under this standard, a claimant must prove that counsel's representation so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Strickland*, 466 U.S. at 686.

To establish his claim that trial counsel's performance was deficient for failing to request

17

an instruction, Trotman must first show that he was entitled to an instruction on the lesser-included offense of murder. *See Kinnamon v. State*, 791 S.W.2d 84, 97 (Tex. Crim. App. 1990) (since evidence did not authorize submission of murder instruction as lesser-included offense appellant's trial counsel was not ineffective for failing to request it), *overruled on other grounds by Cook v. State*, 884 S.W.2d 485 (Tex. Crim. App. 1994) (en banc). To establish he was entitled to an instruction on murder, Trotman must establish that murder is a lesser-included offense of capital murder and that there was evidence that, if guilty of an offense, Trotman was guilty only of murder. *See Rousseau v. State*, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993).

Because murder is a lesser-included offense of capital murder, the relevant inquiry is whether there is some evidence that Trotman is guilty of only the lesser offense. *See Havard v. State*, 800 S.W.2d 195, 216 (Tex. Crim. App. 1990); *Aguilar v. State*, 682 S.W.2d 556 (Tex. Crim. App. 1985). In the factual setting of the instant case, the relevant inquiry is whether there is conflicting evidence concerning whether Trotman killed Ryan in the course of committing or attempting to commit a robbery. *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (defining capital murder as murder committed in course of robbery or attempted robbery). We have previously discussed the evidence in support of Trotman's capital murder conviction, i.e., that Trotman killed Ryan while in the course of committing or attempting to commit a robbery. We now consider whether there is any evidence that Trotman merely killed Ryan and did not rob or attempt to rob him.

18

Trotman contends that his entire defense was premised on the concept that he did not go to Ryan's home to rob him; rather, he went there to purchase drugs, and the transaction, for whatever reason, went bad. Rather than claiming the existence of evidence that contradicts the robbery or attempted robbery allegation, Trotman merely claims the evidence of the aggravating circumstance of robbery was so weak that the jury could not have found that element of capital murder beyond a reasonable doubt.[8] Glenisha testified that Trotman burst into the house with a knife drawn, threatening her and demanding money. Trotman also admitted to Jones that he went to Ryan's house to commit a robbery. In addition, the jury heard testimony regarding Trotman's plan for the robbery.[9] Nothing in the record contradicts this evidence. Although Trotman calls into question the strength of this evidence, a challenge to the strength of such evidence does not lower the threshold of conflicting evidence required to receive a lesser-included-offense instruction. Because there is no record evidence to contradict the evidence of attempted robbery, Trotman was not entitled to a jury instruction on the lesser-included offense of murder. *Cf. Robertson v. State*, 871 S.W.2d 701 (Tex. Crim. App. 1993) (affirming capital murder conviction

---

[8]We have previously determined that the evidence here is legally and factually sufficient to support the capital murder conviction.

[9]This evidence included the fact that Trotman insisted on riding with Jones to her aunt's house November 12, 2007. While Jones was inside her aunt's house, Trotman left without telling her where he was going. Jones saw Trotman arrive back at the car running from around the corner, coming from the direction of Rhoden's house. Trotman took the knives, bag, and mask with him to commit the intended robbery. He later admitted to Jones that he hid the knife he had taken from her kitchen up the sleeve of his bulky coat so she would not see it on her way to her aunt's house. The mask worn by Trotman to cover his face was later recovered from Jones' house, along with the clothing Trotman wore during the crime. Jones also identified the bag with Rhoden's blood on it recovered from the crime scene as Trotman's bag that he brought from Dallas. Trotman returned to the car and ordered Jones to drive away. He also instructed Jones to call her aunt and tell her that Jones did not know the man who hopped into her car at her aunt's house. Trotman indicated that, because Jones knew what happened, he would have to kill her and her children.

19

after examining sufficiency of evidence that defendant killed in course of robbing or attempting to rob victim).

Because the evidence did not authorize the submission of a murder instruction as a lesser-included offense, Trotman's trial counsel was not ineffective for failing to request it. However, even if the record before us contained evidence to contradict the evidence of attempted robbery, we would nevertheless be compelled to draw the same conclusion. Indeed, the presumption that trial counsel's performance was reasonably based in sound trial strategy, coupled with the absence of any supporting evidence in the record of unreasonableness, compels a reviewing court to consider ways in which trial counsel's actions were within the bounds of professional norms. *Mata v. State*, 226 S.W.3d 425, 431 (Tex. Crim. App. 2007). Any number of possibilities can be imagined here. For example, trial counsel's trial strategy was to convince the jury that this was a drug deal gone awry. Because this theory required Trotman to be present at the scene during the crime, it is conceivable that trial counsel did not request an instruction on murder because the testimony and physical evidence, including DNA testing, showed that Trotman killed Ryan.

Ineffectiveness of counsel is a matter that must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Smith v. State*, 51 S.W.3d 806, 812 (Tex. App.—Texarkana 2001, no pet.). In the absence of such a record, and in the lack of anything that would indicate such completely ineffective assistance as could be shown without

20

such a record, we overrule the point of error.[10]

We affirm the judgment of the trial court.

Josh R. Morriss, III
Chief Justice

Date Submitted:     June 28, 2010
Date Decided:       July 7, 2010

Do Not Publish

---

[10]Under normal circumstances, the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking in tactical or strategic decision-making as to overcome the presumption that counsel's conduct was reasonable and professional. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001).